# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

SIX STAR HOLDINGS, LLC,
and FEROL, LLC,

      Plaintiffs,

      v.                            Case No. 10-cv-893

CITY OF MILWAUKEE,

      Defendant.

---

**BRIEF OF PLAINTIFFS SIX STAR HOLDINGS, LLC and FEROL, LLC,**

**IN SUPPORT OF MOTION FOR AWARD OF ATTORNEYS' FEES**

---

SIX STAR HOLDINGS, LLC, and FEROL, LLC,

Plaintiffs,

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
131 W. Wilson St., Suite 1200
Madison, WI  53703
Phone:      608 283 6001
Fax:        608 283 0945
E-mail:    jsolson@scofflaw.com

# Table of Contents

STATEMENT OF THE CASE ............................................................. 1

ARGUMENT ................................................................................ 7

I.   The Purposes of Attorneys' Fees Provisions are to Ensure the Enforcement of Civil Rights Laws by Attracting Competent Lawyers to Civil Rights Cases, and to Place the Burden for Paying for the Enforcement of Civil Rights Enactments on the Violators of Such Laws, not on the Victims of such Violations. ................................................................................ 7

   A.   The Principles Governing Attorneys' Fees Awards were Developed in the Context of Civil Rights Cases. ........................................... 7

   B.   The Main Purpose of Fee-Shifting Statutes is to Enable Victims of Civil Rights Violations to Retain Counsel to Represent them in Civil Litigation, by Making such Cases Financially Attractive to Lawyers, through Authorizing Fee Awards that may Exceed the Damages at Stake. ..................................... 10

   C.   The Other Purpose of Fee-Shifting Provisions is to Place the Financial Burden of Enforcement on the Violators, not the Victims. .............................. 12

II.  There Is No Prohibition on Attorneys' Fees Awards Exceeding Damages Recoveries. ............................................................................ 13

III. A  Plaintiff Who Wins Relief in Court is a Prevailing Party Within the Meaning of the Fee-Shifting Provisions of the Civil Rights Attorneys' Fees Awards Act of 1976 ..................................................................... 15

IV.  The Court has Discretion to Determine the Amount of Attorneys ' Fees to be Awarded, so long as its Decision is Based on Evidence of Record and Controlling Principles of Law. .......................................................... 16

V.   The "Lodestar" Product of an Attorney's Hours Reasonably Invested in the Case Multiplied by His or Her Reasonable Hourly Rate in Reference to the Actual Market for Legal Services is Strongly Presumed to be an Appropriate Award. .................................................................................. 18

VI.  The Evidence Shows that the Hours Invested by the Plaintiffs' Attorneys Were Reasonable in Number. ............................................. 22

i

A.   The Declarations Submitted in Support of the Motion for Attorneys' Fees and Costs Show that the Hours Invested in the Case by Mr. Olson's Firm were Reasonable in Number. ................................................... 22

VII.   Because the Fee-Shifting Claims on which the Plaintiff Prevailed were Related on the Facts or the Law or Both to the Claims the Plaintiff Lost, and Because the Plaintiff's Attorneys did not Invest an Unreasonable Amount of Time in this Case, the Number of Hours Actually Worked By The Plaintiff's Attorneys, Reduced by the Application of Billing Judgment, is the Appropriate Basis for the Fee Award. ......................................................................... 23

A.   Plaintiff's Counsel Are Entitled to be Compensated for Both (1) Time Invested in Successful Claims and (2) Time Invested in Other Claims that Were Related to the Successful Claims on the Facts or the Law or Both. ...... 23

VIII.   Because the Billing Rates Attorney Olson Requests the Court to Award for His and His Staff Members' Services were (1) Their Actual Billing Rates For Paying Clients, (2) Within The Range of Rates Charged in the Community by Attorneys of Similar Skill, Reputation and Experience, They are the Appropriate Basis for a Fee Award in this Case. .................................................. 24

A.   The Court's Obligation is to Determine, From the Evidence, the Market Rates for these Attorneys' and Staff Members' Services. ................................ 24

B.   If an Attorney's Actual Billing Rate for Paying Clients Is Within the Range of Market Rates Actually Charged by Attorneys of Similar Skill, Experience and Reputation, it is the Appropriate Basis for a Fee Award. ..... 27

C.   All the Evidence Establishes that the Rates Sought by Counsel in this Fee Application Were the Market Rates for their Services. ............................. 31

1.   Clients Pay these Standard Billing Rates. ............................................. 31

2.   The Declarations Support the Olson Firm's Hourly Rates. ............... 31

3.   In Particular, the Hourly Rate of Sarah Furey Crandall is Reasonable. ................................................................................................. 32

4.   Many Law Firms Charge Attorney Market Rates for the Services of Personnel Whose Job Descriptions are Indistinguishable from that of Mrs. Crandall. ......................................................................................................... 34

IX.   The Court Should Determine the Fee Award Using Current Hourly

Rates Rather than the Rates in Place when the Work was Done, in Order to Ensure that Plaintiff's Counsel is Compensated for Delay in Receiving Payment...................................................................................................... 37

    A.   The U.S. Supreme Court and Seventh Circuit award attorney's fees under 42 USC §1988 at current rates to compensate for the delay in receiving payment................................................................................................ 37

    B.   Compensation for delay in payment arises out of the business reality that plaintiff's firms bear the expense and uncertainty of awaiting the future payment of attorney's fees.................................................................... 39

X.   The Court Should Make No Post-Lodestar Reduction in the Fee Award to Account for the Result Obtained. .......................................................... 40

    A.   In this Case, a Post-Lodestar *Hensley* Reduction for "Results Obtained" is not Appropriate.................................................................................... 40

    B.   It Does Not Make Any Sense to Penalize a Litigant for Mentioning a Damages Figure only in Closing Argument, or to give Plaintiff's Lawyers an Economic Incentive to Sell Their Damages Claims Short in Closing Argument. ........................................................................................ 44

XI.   Litigation Expenses that an Attorney Would Ordinarily Bill to a Paying Client Are Recoverable in Connection With an Attorneys' Fees Award under Ordinary Fee-Shifting Statutes................................................................ 45

CONCLUSION ........................................................................................ 45

## STATEMENT OF THE CASE

This action was commenced by Plaintiff Six Star Holdings, LLC, on October 12, 2010, to seek relief against Milwaukee city ordinances that Six Star contended was preventing it from opening a gentlemen's club in downtown Milwaukee, and which it alleged were unconstitutional. A First Amended Complaint (dkt. # 5) on behalf of both current Plaintiffs, Six Star Holdings, LLC, and Ferol, LLC, was filed immediately.

The City moved to dismiss some of the Plaintiffs' claims. (Dkt. # 8.)

On May 23, 2011, the Court entered an order granting the City's motion to dismiss in part. (Dkt. # 18.) The Court characterized the city's regulatory scheme as follows:

> Like many municipalities, however, the City regulates businesses that present erotic entertainment. The exact form this regulation takes depends on whether the business plans to serve alcoholic beverages – i.e., whether it intends to operate as a tavern. If it does, then the business must obtain a liquor license along with a tavern-amusement license by following the procedures in Chapter 90 of the City of Milwaukee Ordinances. If the business does not intend to serve alcohol, the business is not subject to Chapter 90 but is subject to zoning regulations that pertain to "adult entertainment establishments." See City of Milwaukee Ordinances § 295-201-11.1. The zoning regulations are such that adult entertainment establishments are allowed to exist only in certain commercial districts, and then only if the establishment applies for and obtains a special-use permit. *See id*. §§ 295-603-1 & 295-703-1. To obtain the necessary permit, the business owner must file an application and attend a public hearing before the City's Board of Zoning Appeals ("BOZA"), the entity having the authority to grant or deny the special-use permit. *See id*. § 295-311-2.

1

(Dkt. # 18, 1-2.)

The Court went on to hold that the language chosen by the Plaintiffs in their First Amended Complaint did not allege a clear and present intention to open a dry club sufficiently to make out an "actual or imminent injury to plaintiffs resulting from the existence of the special-use requirement" (*id.*, 5), and granted the motion to dismiss this branch of the Plaintiffs' case, for want of standing. (*Id.*, 5.) In the same order, the Court left the door open for the revivification of these claims:

> If and when plaintiffs' Chapter 90 claims fail, at that time they may decide to open adult entertainment establishments, and if they do they may then challenge the special-use requirement by filing a supplemental complaint under Federal Rule of Civil Procedure 15(d). Similarly, if plaintiffs change their minds and decide to open adult entertainment establishments even before their Chapter 90 claims are resolved, they may revive their challenge to the special-use requirement.

(*Id.*, 5.)

In August of 2011, the Plaintiffs moved for leave to file a second amended complaint in which they alleged more forcefully that they wanted to open a dry gentlemen's club and that, but for the challenged zoning ordinance, they would do so immediately. (Dkt. ## 21; 21-1, ¶ 418.) The city opposed the motion to amend on the basis that, "The City has repealed all provisions of the [zoning] Code pertaining to zoning regulation of 'adult entertainment establishments,' per File No. 110130, effective as of July 23, 2011." (Dkt. # 22, 3.) The Plaintiffs then withdrew their motion for leave to file their second amended complaint. (Dkt. #

2

23.) On August 24, 2011, an assistant city attorney advised Plaintiffs' counsel that, after the repeal of the zoning provisions relating to dry gentlemen's clubs, one would need a theater license to open such a club. (Dkt. # 30.)

On September 14, 2011, Six Star filed an application for a theater license. (Dkt. # 29, 2.)

The Plaintiffs then moved for leave to file a third amended and supplemented complaint. (Dkt. # 25.) This iteration of the complaint attacked the City's "tavern amusement license" ordinance in Chapter 90 and the City's theater licensing ordinance. (Dkt. # 25). The City opposed this amendment on several grounds, including a contention that the new complaint did not address the City's "Public Entertainment Club" ordinance. (Dkt. # 26, 6.) The Plaintiffs responded by filing a fourth complaint that challenged the "Public Entertainment Club" ordinance as well. (Dkt. # 29.) Over the City's opposition, on February 28, 2012, the Court granted the Plaintiffs' motion to file their Fourth Amended and Supplemented Complaint. (Dkt. # 35.)

By way of an answer, on March 13, 2012, the City said, "effective 3/1/2012, [Milwaukee] has amended, repealed, recreated and/or created several provisions to the City's public entertainment regulations. The City now regulates the presentation of erotic dance entertainment within its borders solely by the content-neutral provisions of amended Milwaukee Code of Ordinances (MCO) Chapter 108, Public Entertainment Premises." (Dkt. # 37, ¶ 9.)

The Plaintiffs did *not* elect to file a fifth amended complaint to address this

3

new ordinance.[1] Thus, the pleading phase of the case ended and the case went forward as a damages case involving the constitutionality of ordinances that had been repealed and were no longer on the books, but which allegedly had prohibited the Plaintiffs from opening a gentlemen's club or clubs while the ordinances had been in effect (through March 12, 2012), and thereby caused the Plaintiffs to suffer lost-profits damages.

The Court convened a scheduling conference and established a briefing schedule for the parties' dispositive motions. (Dkt. # 38.) Both sides filed motions for summary judgment, and, on March 18, 2013, the Court issued its initial decision. (Dkt. # 78.) The Court granted the City's motion for summary judgment as to the Plaintiffs' claims that the tavern and tavern amusement licensing ordinances in Chapter 90 were unconstitutional and dismissed those claims. (*Id.*, 18.)

As to the Plaintiffs' claims challenging the ordinances restricting the ability to open a "dry" gentlemen's club, the Court ruled, "plaintiffs' motion for summary judgment on the issue of whether the theater ordinance was unconstitutionally applied to it will be granted. This result eliminates the need to address Six Star's facial challenge to the repealed ordinance." (*Id.*, 21.) The basis for this latter holding was that Six Star, which had applied for a theater license only to see the processing of its application indefinitely delayed, would have,

---

[1] The constitutionality of the new ordinance is the subject of a separate action by the same Plaintiffs, pending before this Court as Case No. 2:15-cv-00175-LA.

4

under the City's ordinances, been able to open a gentlemen's club under either a theater license or a public entertainment club license, so, once it had established that the theater licensing ordinances was unconstitutional, there were no additional damages to be recovered from a decision that the public entertainment club ordinance was unconstitutional as well. (*Id.*, 20-21.)

As to Plaintiff Ferol, which had not applied for a theater license, the Court said that Ferol had not yet made a sufficient showing that, in the absence of the challenged ordinances, it would have opened a dry club. (*Id.*, 21-22.) The Court said it would "not adjudicate Ferol's facial challenge to Chapter 83 [the theater licensing ordinance] on the merits at this time. However, should Ferol believe that it can establish Article III standing, it may submit appropriate affidavits to that effect and I will reconsider this ruling." (*Id.*, 22.) As to the Plaintiffs' challenges to the Public Entertainment Club ordinance, the Court said, "I do not need to reach the merits of plaintiffs' facial challenges to Chapter 108 at this time. Again, if Ferol believes that it can establish Article III standing, it may submit appropriate affidavits and I will reconsider this ruling." (*Id.*, 23.)

The Plaintiffs did submit papers in an effort to make the showing invited by the Court. (Dkt. ## 79, 81, 82.) The Defendant contended that the Plaintiffs' showing was insufficient. (Dkt. # 84.) On August 28, 2013, the Court issued its decision. (Dkt. # 87.) The Court held that each Plaintiffs' evidence that it would have opened a dry club but for the existence of the challenged ordinances was sufficient to permit its claims to survive the City's motion for summary judgment

5

on the standing issue, but not sufficient to entitle either Plaintiff to summary judgment on this issue of fact – it would have to remain to be determined at a trial. (*Id.*, 2-3.)

On the issue of the constitutionality of the theater licensing and public entertainment club ordinances, the Court held that both of these ordinances were unconstitutional. It denied the City's motion for summary judgment and granted the Plaintiffs' motion for partial summary judgment, holding that, "if Ferol establishes at trial that it would have operated a dry gentlemen's club but for the existence of the theater and public entertainment club ordinances, it will be entitled to recover damages for the period in which the ordinances prevented it from doing so."  (*Id.*, 7.)

That trial was held over February 17-19, 2015, on the two questions of whether Plaintiff Ferol would have opened a dry club but for the unconstitutional ordinances, and, if it had, how much profit it would have made through the effective date of the ordinances' repeal, March 12, 2012.[2]

The jury returned a special verdict answering the first question, "yes," and finding lost profits in the amount of $435,500.00. (Dkt. # 121.) On the same day, February 19, 2015, the Court entered judgment as follows:

IT IS ORDERED AND ADJUDGED that plaintiff Ferol LLC shall

---

[2] The two Plaintiff companies, both vehicles for the business ventures of Jon Ferraro and a group of investors recruited by him, had candidly acknowledged that they would have been unlikely to both open separate dry clubs simultaneously, and they proceeded to trial only on the business plan of Ferol, LLC, to have opened a dry club at 117 W. Pittsburgh Avenue, where it had signed a lease covering the time frame at issue.

recover $435,500.00 from the defendant City of Milwaukee on its
claim involving the theater and public entertainment club
ordinances. IT IS FURTHER ORDERED AND ADJUDGED that
plaintiff Six Star Holdings, LLC, shall recover $1.00 in nominal
damages from the defendant City of Milwaukee on its claim
involving the theater ordinance. The plaintiffs shall take nothing
with respect to their claims involving tavern licenses.

(Dkt. # 122.)

At the Plaintiff's unopposed request, the Court extended the date by

which the Plaintiffs might file their motion for an award of attorneys' fees under

42 U.S.C. § 1988 to April 20, 2015. (Docket entry of March 5, 2015.) This is the

Plaintiffs' brief in support of that motion.


## ARGUMENT

I. **The Purposes of Attorneys' Fees Provisions are to Ensure
the Enforcement of Civil Rights Laws by Attracting
Competent Lawyers to Civil Rights Cases, and to Place the
Burden for Paying for the Enforcement of Civil Rights
Enactments on the Violators of Such Laws, not on the
Victims of such Violations.**

A. **The Principles Governing Attorneys' Fees Awards
were Developed in the Context of Civil Rights
Cases.**

Prior to 1975, numerous federal courts had been developing a body of

law that authorized attorneys' fees awards under a "private attorney general"

theory, in cases where litigation could be said to vindicate important

constitutional or statutory rights, or confer benefits on the public at large.

*Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968) (per curiam)(A

prevailing plaintiff in a civil rights suit serves as a "private attorney general, helping to ensure compliance with civil rights laws and benefiting the public by vindicating a policy that Congress considered of the highest priority.") (internal quotation marks and citations omitted)).

The private attorney general theory was temporarily extinguished by the decision of the U.S. Supreme Court in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975), but Congress responded almost immediately by enacting the Civil Rights Attorneys' Fees Awards Act of 1976, codified at 42 U.S.C. § 1988. This law authorized awards of attorneys' fees, over and above other available relief, for prevailing civil rights plaintiffs. As with other fee-shifting provisions, its twin purposes were 1) to enable victims of civil rights violations to secure legal representation by providing attorneys a modest incentive to take such cases: their regular fees, paid only if they win, and 2) to relieve the innocent victims of civil rights violations of the financial burdens of paying for these legal services out of their recoveries – or their own pockets -- so that they could be made, in the end, more completely whole.

The first significant case decided by the Supreme Court under § 1988 was *Hensley v. Eckerhart*, 461 U.S. 424 (1983). *Hensley* struck the opening chord of a theme which has run throughout the jurisprudence of § 1988 and other fee-shifting statutes: if attorneys' fees awards are going to attract lawyers who are competent to litigate complex and stiffly resisted civil rights claims, that is, if they are going to attract lawyers from among the ranks of the best courtroom

8

advocates the bar has to offer, they must offer this pool of potential champions financial incentives fully equivalent to those offered by the private market of fee-paying clients. The Court said, "[I]n computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, for all time reasonably expended on a matter." *Id.* at 431. *See also, e.g., Evans v. Jeff D.,* 475 U.S. 717, 732 (1986) (". . . it is undoubtedly true that Congress expected fee shifting to attract competent counsel to represent citizens deprived of their civil rights. . . ."); *Henry v. Webermeier,* 738 F.2d 188 (7th Cir. 1984) (". . . the object of judicial fee determination is to simulate the results that would obtain if the lawyer were dealing with a paying client. . . ."

The legislative mandate behind fee-shifting provisions is clear:

> At a number of points, the legislative history of § 1988 reveals Congress' basic goal that attorneys should view civil rights cases as essentially equivalent to other types of work they could do, even though the monetary recoveries in civil rights cases (and hence the funds out of which their clients would pay legal fees) would seldom be equivalent to recoveries in most private-law litigation. Thus, the Senate Report specifies that fee awards under § 1988 should be equivalent to fees "in other types of equally complex federal litigation, such as anti-trust cases" and not be reduced because the rights involved may be nonpecuniary in nature.

*Hensley v. Eckerhart,* 461 U.S. 424, 447 (1983) (Brennan, J., concurring).

**B.** **The Main Purpose of Fee-Shifting Statutes is to Enable Victims of Civil Rights Violations to Retain Counsel to Represent them in Civil Litigation, by Making such Cases Financially Attractive to Lawyers, through Authorizing Fee Awards that may Exceed the Damages at Stake.**

In *Hensley v. Eckerhart*, 461 U.S. 424 (1983)**,** the Supreme Court recognized that "the purpose of § 1988 is to insure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983), quoting H.R. Rep. No. 94-1588, p. 1 (1976). This end can be achieved by fee-shifting provisions only if, as implemented by courts, they actually fulfill their statutory purpose of attracting competent counsel to civil rights cases. *Blanchard v. Bergeron***,** 489 U.S. 87, 93 (1989). *See, e.g., Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 562-563 (7th Cir. 1994)("These fee-shifting statutes were enacted for the purpose of encouraging the private prosecution of certain favored actions, by requiring defendants who have violated plaintiffs' rights to compensate plaintiffs for the costs they incurred to enforce those rights.")[3]

---

[3] Many statutes, state and federal, permit innocent persons who are injured by certain forms of unlawful conduct to recover attorneys' fees. In general, courts construe these "fee shifting" provisions according to a set of common principles.

> . . . we see no reason why the calculation of a reasonable fee for Clean Air Act purposes should differ from the same calculation that courts undertake pursuant to other provisions with the identical standard. Accordingly, we hold that the jurisprudence regarding the calculation of reasonable attorneys fees developed in connection with other attorneys fee statutes — particularly § 1988 — is applicable to cases brought pursuant to § 304(d).

*Delaware Valley Citizens' Council v. Com., Pa.***,** 762 F.2d 272, 275, (3rd Cir. 1985)(aff'd. on this point, *Pennsylvania v. Del. Valley Citizens' Council*, 478 U.S. 546, 556 (1986). See also,

The Seventh Circuit has explained that the purpose of fee shifting in cases where plaintiffs prevail on smaller claims is to enable such claims to be litigated, and that this purpose would be "thwarted by capping the attorneys' fees award at the level of the damages award." *Id.* This is because private enforcement of laws securing federally-protected rights was believed by Congress to have beneficial effects emanating far beyond the parties involved in individual cases. *Green v. Torres*, 361 F.3d 96, 100 (2d Cir. 2004)("The general purpose of fee-shifting statutes such as § 1988(b) is to permit plaintiffs with valid claims to attract effective legal representation and thereby to encourage private enforcement of civil rights statutes, to the benefit of the public as a whole." (internal quotation marks and citation omitted).

Because plaintiffs in civil rights cases are doing the hard work of ensuring that violations of the nation's most sacred rights do not pass without sanction, even when the costs of securing justice in a particular case may be disproportionate to the individual injury to be redressed, they are still often referred to by the Courts as "private attorneys general."

> Attorney's fees in Title VII litigation are not limited to a proportion of the monetary damages assessed in the case because, as Congress has recognized, a plaintiff in any civil rights suit acts "not for himself alone but also as a `private attorney general,' vindicating a policy that Congress considered of the highest importance." *City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986) (quoting H.R. Rep. No. 94-1558, p. 2 (1976), reprinted in 1976 U.S.C.C.A.N. 5908). "Because damages awards do not reflect fully

---

*Chambers v. Ohio Dept. of Human Services*, 273 F.3d 690, 692 n. 1 (6th Cir. 2001) (all fee-shifting statutes to be treated consistently).

the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief." *Rivera*, 477 U.S. at 575.

> A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts. This is totally inconsistent with Congress's purpose in enacting sec. 1988. Congress recognized that private-sector fee arrangements were inadequate to ensure sufficiently vigorous enforcement of civil rights. In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case.

*Dunning v. Simmons Airlines, Inc.*, 62 F.3d 863, 873, n. 13 (7th Cir. 1995).

### C. The Other Purpose of Fee-Shifting Provisions is to Place the Financial Burden of Enforcement on the Violators, not the Victims.

Fee-shifting provisions reflect an important congressional determination that the violators of Americans' civil rights, not the victims of those violations, should pay for the civil litigation required to set things right. See, *e.g.*, *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 137 (2005)(Fee award was appropriate in *Piggie Park*, "because the civil rights defendant, who is required to pay the attorney's fees, has violated federal law.")(citing *Flight Attendants v. Zipes*, 491 U.S. 754, 762 (1989) ("Our cases have emphasized the crucial connection between liability for violation of federal law and liability for attorney's fees under federal fee-shifting statutes").

## II. There Is No Prohibition on Attorneys' Fees Awards Exceeding Damages Recoveries.

In an ordinary personal injury case, the $435,500 verdict in this case would net the Plaintiffs' attorney a one-third contingent fee, $145,000. But, in civil rights cases, the Supreme Court has reasoned that the magnitude of a plaintiff's success, and thus of its right to recover an award of his attorneys' fees, cannot be measured solely in monetary terms, because a civil rights plaintiff necessarily secures important non-monetary benefits to society at large by vindicating important civil and constitutional rights. *See, City of Riverside v. Rivera*, 477 U.S. at 571, 574 (1986). The Court explained that "[b]ecause damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief." *Id.* at 575.

Fee awards under fee-shifting statutes regularly exceed the plaintiff's recovery. *See e.g.*, *City of Riverside*, 477 U.S. at 580 (awarding $245,450 fees on a $33,350 recovery); *Tuf Racing Products v. American Suzuki Motor*, 223 F.3d 585 (7th Cir. 2000)( $391,318 in attorneys' fees for recovering $137,000 in damages); *Grant v. Martinez*, 973 F.2d 96, 101 (2d Cir. 1992)(fee award of $500,000 on $60,000 settlement); *Duval v. Midwest Auto City, Inc.*, 578 F.2d 721, 725-26 (8th Cir. 1978) ($14,000 fees on a $3,690 recovery in an odometer fraud case); *Cange v. Stotler and Co.*, 913 F.2d 1204 (7th Cir. 1990)(affirming award of $80,218.35 attorney's fees on a damages award of $43,666.79 under the Illinois Consumer Fraud Act); *Perez v.*

13

*Perkiss*, 742 F. Supp. 883, 888-92 (D. Del. 1990)(over $10,000 in fees on a $ 1,200 recovery); *Tolentino v. Friedman*, 46 F.3d 645, 653 (7th Cir. 1995), *cert. denied,* 115 S.Ct. 2613 (1995) (district court ordered to increase fee award upward from $10,132.50 on a $1,000 recovery: "Congress provided fee shifting to enhance enforcement of important civil rights, consumer-protection, and environmental policies. By providing competitive rates we assure that attorneys will take such cases, and hence increase the likelihood that the Congressional policy of redressing public interest claims will be vindicated."); *Armstrong v. Rose Law Firm*, 2002 WL 31050583 (D. Minn. 2002) ($43,180.00 in fees on a $1,000.00 recovery).

As the Seventh Circuit, in a case involving an award of $500 for false arrest, reasoned:

> The district court based its decision to award no fees on the small size of the verdict and the fact that the case broke no new ground in the law of police abuses. If these are sufficient grounds it means that routine police misconduct that, although unconstitutional, is neither harmful enough to support a large award of compensatory damages nor malicious enough to justify an award of punitive damages is, as a practical matter, beyond the reach of the law. It is impossible, unless there is an expectation of a fee award (and often not then), to interest a competent lawyer in bringing a suit in federal court to recover a small amount of damages unless the plaintiff is a rich person willing to finance the suit out of his own pocket rather than by means of a contingent-fee contract, the normal way in which tort suits are financed in this country. Yet the cumulative effect of petty violations of the Constitution arising out of the interactions between the police (and other public officers) and the citizenry on the values protected by the Constitution may not be petty, and if this is right then the mere fact that a suit does not result in a large award of damages or the breaking of new constitutional ground is not a good ground for refusing to award

any attorneys' fees.

*Hyde v. Small*, 123 F.3d 583, 585 (7th Cir.1997) (Posner, J.).

### III. A Plaintiff Who Wins Relief in Court is a Prevailing Party Within the Meaning of the Fee-Shifting Provisions of the Civil Rights Attorneys' Fees Awards Act of 1976.

Since § 1988 and other fee-shifting statutes explicitly authorize a fee award to a "prevailing party", the *Hensley* court formulated a definition of this term, and adopted the rule of *Nadeau v. Helgemoe*, 581 F.2d 275, 278-279 (1st Cir. 1978), which had stated that civil rights claimants

> may be considered "prevailing parties" for attorneys' fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.

*Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983).

In *Hewitt v. Helms*, 482 U.S. 755, 760 (1987), the Court had held that "[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail." In *Rhodes v. Stewart*, 488 U.S. 1, 3-4 (1988), the Court had said that, at a minimum, to be considered a prevailing party, a plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between himself or herself and the defendant.

In *Texas Teachers Association v. Garland School District*, 489 U.S. 782 (1989), the Supreme Court reiterated its adoption of the *Nadeau* test quoted above and recognized that only the most purely technical victory would fail to qualify a civil rights claimant as a prevailing party:

. . . A technical victory may be so insignificant. . . as to be insufficient to support prevailing party status. . . . Where the plaintiff's success on a legal claim can be characterized as purely technical or *de minimis*, a district court would be justified in concluding that even the "generous formulation" we adopt today has not been satisfied. . . . The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute. Where such a change has occurred, the degree of the plaintiff's overall success goes to the reasonableness of the award under *Hensley*, not to the availability of a fee award *vel non*.

*Texas Teachers Association v. Garland School District*, 489 U.S. 782, 792 (1989).

There can be no serious contention that the Plaintiffs were not the prevailing parties in this case.

**IV.    The Court has Discretion to Determine the Amount of Attorneys ' Fees to be Awarded, so long as its Decision is Based on Evidence of Record and Controlling Principles of Law.**

In *Fox v. Vice*, _____ U. S. _____, 131 S.Ct. 2205 (2011), the Supreme Court reiterated that the standard for appellate review of attorneys' fee awards is abuse of discretion. *Id.*, at 2216. The Court said that "trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time," *id.*, and directed the Courts of Appeals to "give substantial deference to these determinations." *Id.* At the same time the Court made clear that an error of law in a district court's award of attorneys' fees is by definition an abuse of discretion. *Id.*

The Court summed up the standard of review with a nicely turned

16

metaphor: "A trial court has wide discretion when, but only when, it calls the game by the right rules."*Id.*, at 2217.

Although a trial court has wide discretion in calculating an appropriate fee award, if an hourly rate or number of hours is reduced, a clear explanation must be provided. *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 518 (7th Cir. 1993). The other Courts of Appeals also require that district courts adequately explain their decisions with respect to fee awards. One typical formulation is found in the decision of the Ninth Circuit in *McCown v. City of Fontana*, 565 F.3d 1097 (9th Cir. 2009), where the court said, "Once the district court completes its analysis of the final lodestar amount, it must explain how it arrived at its determination with sufficient specificity to permit an appellate court to determine whether the district court abused its discretion in the way the analysis was undertaken."*Id.*, at 1102. Finding no adequate explanation in the decision under review, the court vacated and remanded.

"Where the difference between the lawyer's request and the court's award is relatively small, a somewhat cursory explanation will suffice. But where the disparity is larger, a more specific articulation of the court's reasoning is expected." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir., 2008), citing *Bogan v. City of Boston*, 489 F.3d 417, 430 (1st Cir.2007).

The Seventh Circuit has also repeated the prohibition against a trial court "eyeballing" a fee application and arbitrarily reducing the fee requested by the prevailing party without evidence to support the reduction. *People Who Care v.*

*Rockford Bd. of Educ.*, 90 F.3d 1307, 1314 (7th Cir. 1996).

> **V.      The "Lodestar" Product of an Attorney's Hours Reasonably Invested in the Case Multiplied by His or Her Reasonable Hourly Rate in Reference to the Actual Market for Legal Services is <u>Strongly</u> Presumed to be an Appropriate Award.**

In *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the Supreme Court first

endorsed the "lodestar method" for calculating the amount of an attorneys' fees

award under a fee-shifting statute, saying:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.

*Id.*, at 433.

The *Hensley* court went on to emphasize that the party seeking an award

of fees has an obligation to submit admissible evidence upon which the Court

may base such a calculation:

> The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

*Id.*

The lodestar [4] product of hours multiplied by rates was elevated from a

"starting point" to the presumptive fee award in *Blum v. Stenson*, 465 U.S. 886

---

[4] The term "lodestar" to mean the product of an attorney's hours reasonably invested in the case multiplied by his or her reasonable hourly rate was coined by the United States Court of Appeals for the Third Circuit in *Lindy Bros. Bldrs., Phila. v. AM. R. & S. San.*, 487 F.2d 161 (3rd Cir. 1973).

(1984).  In that case, while the Supreme Court recognized that "there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high," *Id.* at 897, such post-lodestar adjustments should be rare:

> When, however, the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee contemplated by § 1988.

*Id.*

Early on, courts often made willy-nilly adjustments, upward and downward, to lodestar figures that were otherwise rather firmly grounded in the evidence, based on the twelve factors which were said to be relevant to the level of a reasonable attorneys' fee in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  In fact, this sort of *ad hoc* adjustment occurred so frequently that these factors became known as the "*Johnson* factors." *Lynch v. City of Milwaukee*, 747 F.2d 423, 426 (7th Cir. 1984). These 12 factors, taken from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2-106 (1980), were:

> (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

19

*Pennsylvania v. Del. Valley Citizens' Council*, 478 U.S. 546, 562, n. 7 (1986).

In *Blum*, the Supreme Court began to dismantle the mechanism for such post-lodestar adjustments based on the *Johnson* factors.

In *Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* 478 U.S. 546 (1986), the Supreme Court traced the history through which the lodestar method had replaced *ad hoc* consideration of the *Johnson* factors.

The Court said, reprising its opinion in *Blum v. Stenson,* 465 U.S. 896 (1984):

> We emphasized, however, that the figure resulting from this [lodestar] calculation is more than a mere "rough guess" or initial approximation of the final award to be made. Instead, we found that "[w]hen . . . the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product *is presumed* to be the reasonable fee" to which counsel is entitled. . . .

*Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* 478 U.S. 546, 564 (1986) (emphasis added in *Delaware Valley*).

The *Delaware Valley* opinion went on to note that "many of the *Johnson* factors 'are subsumed within the initial calculation' of the lodestar." 478 U.S. at 565, including the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation and, most significantly, the results obtained. The Court concluded that "a strong presumption that the lodestar figure -- the product of reasonable hours times a reasonable rate -- represents a 'reasonable' fee is wholly consistent with the rationale behind the usual fee-shifting statute. . . ." *Id.* at 565, quoting *Blum v. Stenson,* 465 U.S., at 898-

900.

When the presumptive correctness of the lodestar as the most reasonable

fee award in any given case was re-emphasized by the Supreme Court in 2010 in

*Perdue v. Kenny A. ex rel. Winn*, _____ U.S. _____, 130 S.Ct. 1662 (2010), the Court

noted that there are many reasons for this judge-made rule. *Id.*, at 1672.

First, the lodestar method relies on prevailing market rates. Thus, "the

lodestar method produces an award that *roughly* approximates the fee that the

prevailing attorney would have received if he or she had been representing a

paying client who was billed by the hour in a comparable case."*Id.*[5] Second, "the

lodestar calculation is objective, and thus cabins the discretion of trial judges,

permits meaningful judicial review, and produces reasonably predictable

results." *Id.*, (internal quotation marks and citation omitted).

Indeed, in *Perdue*, the Supreme Court again reminded lower courts that

the presumption that the lodestar method yields a correct award of fees "is a

strong one." *Id.*, at 1672 (internal quotation marks and citation omitted).

---

[5] This formulation, referencing the desirability of replicating, in a fee award, the fee that a private paying client would pay to a lawyer hired on the open market, is also useful guidance in resolving may questions as to the treatment of categories of time, i.e., travel time, or the time of law clerks and paralegals, and categories of expenses, when calculating fee awards. The first effort should always be to imitate the private market. See, e.g., *Henry v. Webermeier*, 738 F.2d 188, 195 (7th Cir. 1984) (". . . the object of judicial fee determination is to simulate the results that would obtain if the lawyer were dealing with a paying client. . . .")

**VI.    The Evidence Shows that the Hours Invested by the Plaintiffs' Attorneys Were Reasonable in Number.**

A plaintiff's civil rights lawyer has no incentive to invest unnecessary time in a case:

> It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker.

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir., 2008).

**A.    The Declarations Submitted in Support of the Motion for Attorneys' Fees and Costs Show that the Hours Invested in the Case by Mr. Olson's Firm were Reasonable in Number.**

The Plaintiff's attorney has submitted a number of declarations in support of his motion for fees and costs.  A number of the declarants have opined that the number of hours for which compensation is sought in this case is reasonable. (*See, e.g.*, Declaration of Michael R. Fox at ¶ 14(f); Declaration of Robert J. Kasieta at ¶ 4; Declaration of Walter F. Kelly at ¶ 6; Declaration of Sally A. Stix at ¶ 20; Declaration of Sarah Siskind at ¶ 6.)

22

**VII.    Because the Fee-Shifting Claims on which the Plaintiff
Prevailed were Related on the Facts or the Law or Both to
the Claims the Plaintiff Lost, and Because the Plaintiff's
Attorneys did not Invest an Unreasonable Amount of Time
in this Case, the Number of Hours Actually Worked By
The Plaintiff's Attorneys, Reduced by the Application of
Billing Judgment, is the Appropriate Basis for the Fee
Award.**

**A.    Plaintiff's Counsel Are Entitled to be Compensated
for Both (1) Time Invested in Successful Claims and
(2) Time Invested in Other Claims that Were Related
to the Successful Claims on the Facts or the Law or
Both.**

In *Hensley v. Eckerhart,* 461 U.S. 424 (1983), the Supreme Court first said that

legal work on unsuccessful claims which are based on *both* different facts and

different legal theories from those that made up the successful claims advanced in

the same lawsuit may not be compensated under § 1988 -- "the Congressional intent

to limit awards to prevailing parties requires that these unrelated claims be treated

as if they had been raised in separate lawsuits, and therefore no fee may be

awarded for services on the unsuccessful claim." *Id.* at 435.  However, the Court

went on to observe that many civil rights cases involve a "common core of facts" or

"related legal theories." *Id.*  The Supreme Court recognized that in such cases, it is

inappropriate to separate hours devoted to unsuccessful claims from those devoted

to successful claims.  Where claims are related on the facts or the law or both, the

lodestar computation should be based on all hours reasonably expended in the

litigation. *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983).  Where a

plaintiff has asserted unsuccessful claims related to the successful
claims by a common core of facts or that are based on related legal

theories, time spent on these related but unsuccessful claims should not automatically be excluded in arriving at a reasonable attorney's fees award. Instead, the court is to undertake a second analysis and focus on the overall results obtained to determine whether it should compensate the plaintiff for the hours spent on the related but unsuccessful claims. Generally, if the results obtained are excellent, the plaintiff's attorney should recover a fully compensatory fee, which will normally encompass all hours reasonably expended on the litigation . If the plaintiff has achieved only partial success, however, compensating the plaintiff for all hours expended on the litigation may be excessive. In such a situation, the court may adjust the award either by identifying specific hours that should be eliminated or by simply reducing the overall award to reflect the plaintiff's limited success.

*Illinois Welfare Rights Org. v. Miller*, 723 F.2d 564, 567 (7th Cir. 1983)(internal

quotation marks and citations omitted).

Thus, in the present case, it is appropriate for the Plaintiff's attorneys to be

compensated for the time spent litigating the entire case.


**VIII.** **Because the Billing Rates Attorney Olson Requests the Court to Award for His and His Staff Members' Services were (1) Their Actual Billing Rates For Paying Clients, (2) Within The Range of Rates Charged in the Community by Attorneys of Similar Skill, Reputation and Experience, They are the Appropriate Basis for a Fee Award in this Case.**

**A.** **The Court's Obligation is to Determine, From the Evidence, the Market Rates for these Attorneys' and Staff Members' Services.**

In *Blum v. Stenson*, 465 U.S. 886 (1984), the narrow question before the

Court was whether public interest attorneys working for organizations that

never charge a fee for their services should be compensated at the same rates as

private attorneys when they win cases under fee-shifting statutes, but the Supreme Court used the case to explain the intent of § 1988 and other fee-shifting statutes as to awarded rates generally. Noting that the legislative history of § 1988 expressly approved of four particular reported opinions[6] as having correctly calculated "fees which are adequate to attract competent counsel but which do not produce windfalls to attorneys," *Id.* at 893-894, quoting S.Rep. No. 94-1011, p. 6 (1976), reprinted in U.S. Code Cong. & Admin. News 1976, pp. 5908-5913, the *Blum* Court said:

> In all four of the cases cited by the Senate Report, fee awards were calculated according to prevailing market rates.

*Id.* at 894. Specifically, the Court went on to say:

> We cannot assume that Congress would endorse the standards used in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), *Stanford Dailey, Davis* and *Swann v. Charlotte-Mecklenberg Board of Education,* 666 F.R.D. 483 (W.D. N.C. 1975), if fee awards based on market rates were viewed as the kind of "windfall profits" it expressly intended to prohibit.

*Id.* at 895.

On this subject, the *Blum* opinion concludes:

> The statute and legislative history establish that "reasonable fees" under section 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel.

*Id.* at 895. In a footnote attached to this text, the Supreme Court specified the

---

[6] *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974), *Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D. Cal. 1974); *Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444 (C.D. Cal. 1974); and *Swann v. Charlotte-Mecklenburg Court of Education,* 66 F.R.D. 483 (W.D.N.C. 1975).

nature of a claimant's evidentiary burden in establishing the market rates for his

counsel's services:

> To inform and assist the Court in the exercise of its discretion, the
> burden is on the fee applicant to produce satisfactory evidence -- in
> addition to the attorney's own affidavits -- that the requested rates
> are in line with those prevailing in the community for similar
> services by lawyers of reasonably comparable skill, experience and
> reputation. A rate determined in this way is normally deemed to
> be reasonable, and is referred to--for convenience--as the prevailing
> market rate.

*Id.* at 895, n.11.

All courts have uniformly followed the clear command of the *Blum*

opinion. See, e.g., *Missouri v. Jenkins,* 491 U.S. 274, 283 (1989) (in determining

"reasonable hourly rates," attorney's fees awarded under §1988 "are to be based

on market rates for the services rendered"); *Glover v. Johnson,* 934 F.2d 703, 716

(6th Cir. 1991) (hourly rate can be established by proving that the rates sought

are rates charged for similar services by lawyers of comparable skill, experience

and reputation); *Malloy v. Monaghan,* 73 F.3d 1012, 1018-19 (10th Cir. 1996)

(imposition of insurance defense attorney's hourly rate on prevailing plaintiff's

attorney is inappropriate); *Pressley v. Haeger,* 977 F.2d 295, 299 (7th Cir. 1992)

(reasonable attorney's fees to be based on "market rates" for legal services);

*Rivera,* 477 U.S., at 591, (Rehnquist, J., dissenting) (reasonableness of fee must be

determined "in light of both the traditional billing practices in the profession, and

the fundamental principle that the award of a 'reasonable' attorney's fee under §

1988 means a fee that would have been deemed reasonable if billed to affluent

plaintiffs by their own attorneys").

### B. If an Attorney's Actual Billing Rate for Paying Clients Is Within the Range of Market Rates Actually Charged by Attorneys of Similar Skill, Experience and Reputation, it is the Appropriate Basis for a Fee Award.

Over the years since *Blum v. Stenson* established that market rates are the appropriate basis for a fee award under a fee-shifting statute, the courts have refined their approach to the determination of the market rates for particular lawyers' services. In *Henry v. Webermeier*, 738 F.2d 188 (7th Cir. 1984), the Court of Appeals took the first step, holding that where

> the plaintiffs' lawyers quite properly took the trouble of obtaining and putting into evidence a number of affidavits, none controverted, setting forth the market rates for southern Wisconsin civil rights trial lawyers with experience comparable to theirs, and establishing that the rates that they were asking were indeed market rates, . . . the hourly rates that the plaintiffs' lawyers submitted were a benchmark that the district judge was not free to ignore.

*Id.*, 738 F.2d at 193.

In *Kurowski v. Krajewski*, 849 F.2d 767 (7th Cir. 1988), the Court wrote:

> Awards of fees under § 1988 are supposed to give counsel the market rate for their time, *Blum v. Stenson*, 465 U.S. 886 (1984), and the kinds of billing and staffing arrangements struck when clients must pay their own lawyers are the best benchmarks of the arrangements (and bills) appropriate under § 1988.

*Id.* 849 F.2d at 776.

An approach which represents an effort, in the vacuum created by the

27

absence of any supporting evidence, to determine a "fair" rate for a prevailing attorney's services, was expressly rejected by the Seventh Circuit in *Pressley v. Haeger*, 977 F.2d 295 (7th Cir. 1992). The Court wrote:

> . . . there is a deeper problem. The judge assumed that he was searching for the "just" or "fair" price of legal services, what the lawyers "deserve." Perhaps in a just world, first violins would earn more than second fiddles. Frequently, in this world, the two earn the same; sometime second chairs earn more. Prevailing plaintiffs are entitled not to a "just" or "fair" price for legal services, but to the *market* price for legal services.... "It is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order."

*Id.* at 13 [emphasis in original, citations omitted].

The *Pressley* court concluded its disapprobation of the district court's reductions in the hourly rates of junior counsel by saying:

> Fee litigation under § 1988 depends on what the market rate is rather than on what litigants and judges think it ought to be. All of the evidence in this record shows that the market rate for these three lawyers' time was $182.00 per hour, and § 1988 requires the judge to use that rate.

*Id.* at 14.

In *Barrow v. Falk*, 977 F.2d 100 (7th Cir. 1992), the Seventh Circuit used the market rate approach to conclude that a fee-applicant was concluded by the market rate he actually charged his paying clients and could not ask, in an application under a fee-shifting statute, for a higher hourly rate based on proof that the market paid higher rates than those he actually charged. The following year, in *Gusman v. Unisys Corp.*, 986 F.2d 146 (7th Cir. 1993), the Court established

the rule that an attorney's actual hourly billing rate, if within the range of market rates charged by other similarly qualified attorneys, is the presumptive basis for an award.

In *Gusman*, the Court considered a fee application submitted by Charles Barnhill, Jr. Barnhill and his co-counsel, Sarah Siskind, submitted affidavits showing the rates their paying clients actually paid, $225.00 and $200.00 per hour respectively. The defense attorneys submitted affidavits they had gathered tending to support an *average* rate for civil rights litigation in the Madison area of $125.00 to $150.00 per hour. The Seventh Circuit rejected this average-rate approach, citing *Barrow v. Falk*, 977 F.2d 1100 (7th Cir. 1992), for the proposition that "the market rate of legal time is the opportunity cost of that time, the income foregone by representing this plaintiff."

Somewhat more clearly, the Court said:

> A client who retains a lawyer with an hourly rate of $100.00, when the average in the community is $150.00, is entitled to collect from his adversary only $100.00 for each hour reasonably expended . . . . And lawyers who fetch above-average rates are presumptively entitled to them, rather than to some rate devised by the court.

*Gusman v. Unisys Corp*., 986 F.2d 1146 (7th Cir. 1993), at 10 [citations omitted].

The Court went on to hold:

> Our recent cases have stressed that the best measure of the cost of an attorney's time is what that attorney could earn from paying clients. For a busy attorney, this is the standard hourly rate. If he were not representing this plaintiff in this case, the lawyer could sell the same time to someone else. That other person's willingness to pay establishes the market's valuation of the

attorneys' services.

*Id.*, 12.

The Court said, "a judge who departs from this presumptive rate must have some reason other than the ability to identify a different average rate in the community." *Id.*, at 13.

The only reason the Court in *Gusman v. Unisys* made an attorney's actual billing rate the *presumptive* award, instead of the *conclusive* award from which the district judge would not be free to deviate at all, was that some lawyers who represent civil rights clients handle all or almost all of their work on a contingent-fee basis and have not compiled a track record of evidence that the market of paying clients will necessarily pay them a certain figure per hour for their time. *Id.*, at 12. The Plaintiffs' counsels' declarations establish that this is not the case with them. They have, for years, had a varied and numerous clientele paying them their regular hourly rates for their work, including a number of corporations and the Ho-Chunk Indian Nation. This is not a case in which the fee-applicant's hourly billing rate is some sort of made-up abstraction. It certainly cannot seem so to those of the Olson firm's clients who have to write checks for its bills every month.

As the Seventh Circuit said in *Balcor Real Estate Holdings, Inc. v. Walentas Phoenix Corp.*, 73 F.3d 150 (7th Cir. 1996):

> Courts award fees at the market rate, and the best evidence
> of the market value of legal services is what people pay for it.
> Indeed, this is not "evidence" about market value; it *is* market

30

value.

*Id.* at 10 (emphasis in original).

### C. All the Evidence Establishes that the Rates Sought by Counsel in this Fee Application Were the Market Rates for their Services.

#### 1. Clients Pay these Standard Billing Rates.

As noted above, the Olson Firm's declarations establish that the firm receives a significant proportion of its annual income, and has since Attorney Olson opened his private practice of law, from paying clients who, without fail, pay the Firm's standard hourly billing rates. Those rates are currently $575 for Mr. Olson, $385 for Trial Consultant Sarah Fury Crandall, $350 for Associate Attorney Andrea J. Farrell, and $155 for law clerks and paralegals. The forgoing authorities establish that the uniform practice of the Olson Firm's clients paying these rates means that this figure is not simply evidence of the market rate that ought to be awarded by this Court for its services; it *is* the market rate for the Olson firm's services.

#### 2. The Declarations Support the Olson Firm's Hourly Rates.

The Declarations of a number of experienced civil rights attorneys were submitted in support of the instant motion, and support the proposition that hourly rates of $575 for Mr. Olson, $385 for Trial Consultant Sarah Fury Crandall, $350 for Associate Attorney Andrea J. Farrell, and $155 for law clerks and

31

paralegals are well within the range of rates charged by attorneys with reasonably comparable skill, reputation and experience. (*See,* (See, e.g., Declaration of Michael R. Fox at ¶ 14; Declaration of Robert J. Kasieta at ¶ 5; Declaration of Walter F. Kelly at ¶ 8; Declaration of Sally A. Stix at ¶ 19; Declaration of Sarah Siskind at ¶ 5.) Attorney Fox's own current hourly billing rate is $650 per hour. (Declaration of Michael R. Fox, ¶ 10.) Attorney Siskind's is $645. (Declaration of Sarah Siskind at ¶ 4.)

### 3. In Particular, the Hourly Rate of Sarah Furey Crandall is Reasonable.

Trial consultant and former attorney Sarah Furey Crandall's time is properly billed at market rates, considering her education and litigation experience and the rate at which paying clients are uniformly billed for her services. In *Sulkowska v. City of New York* 170 F.Supp.2d 359 (S.D.N.Y., 2001), the defense objected to the inclusion compensation for the services of a person who was not then licensed to practice law in an award of fees. The Court rejected the defense contention, saying, "in the Court's view, despite his lack of certification as an attorney, Stephen Cobb's presence at each of the cited conferences and depositions was not only important, but essential to plaintiff's prosecution of her case."

In *Duke v. County of Nassau*, 2003 WL 23315463 (E.D.N.Y.) the court dealt with a challenge to the hourly rates claimed for associates who had graduated from law school but not yet passed the bar exam. In spite of the fact that they

were unable to rise and argue in court or examine witnesses, the court looked to their level of education and their station in their firm, and rejected the idea of compensating these associate at paralegal rates, choosing to use a rate appropriate for a beginning attorney, without regard to the absence of licenses to practice.

> . . . the Court recognizes that Laniox and Lockett were hired by Brewington as associates in his firm, not as paralegals, and that, as such, the work that was assigned to both Laniox and Lockett was of a substantive nature and similar to work that would be assigned to an admitted attorney, albeit a junior attorney. Further, the Court recognizes that, aside from Brewington himself, Laniox billed more hours to this case than any other attorney. It appears that Laniox was a crucial member of the legal team representing the Plaintiff in this case. As such, the Court will use the rate of $100 [the rate the plaintiff had requested] per hour in calculating the lodestar amount for both Laniox and Lockett.

Perhaps more analogous to the present case is *Augustine v. Department of Veterans' Affairs*, 429 F.3d 1334 (Fed. Cir. 2005). In that case an attorney sought a fee award, and the district court denied it on the ground that he had not been licensed to practice in the state where the case had been litigated. The Court of Appeals reversed, holding that fees should be awarded despite the fact that the attorney, one Wild Chang, was not licensed to practice in the state where the case had been litigated.

Chang was licensed in another place. Mrs. Crandall was licensed in another time. Neither fact makes them mere paralegals, or makes paralegal rates appropriate for their compensation. Even if Mrs. Crandall could properly be described as a paralegal, the reasonable hourly rates for paralegals are the

market rates for their services. *Spegon v. Catholic Bishop of Chic.*, 175 F.3d 544, 555, 556 (7th Cir.1999). In the Seventh Circuit, actual billing rates are by definition market rates. *Balcor Real Estate Holdings, Inc. v. Walentas Phoenix Corp.*, 73 F.3d 150 (7th Cir. 1996).

> **4.    Many Law Firms Charge Attorney Market Rates for the Services of Personnel Whose Job Descriptions are Indistinguishable from that of Mrs. Crandall.**

Mrs. Crandall can do anything a licensed attorney could do except talk in court, advise clients and sign documents. To equate her services with those of a mere paralegal "reflects a persistent but not always accurate caricature of law practice" that "tends to undervalue legal research and writing." *Eli Lilly and Co. v. Zenith Goldline Pharmaceuticals, Inc.*, 264 F.Supp.2d 753, 771, n.3, (S.D.Ind., 2003) quoting *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 2002 WL 1801647, *6 (S.D.Ind. July 5, 2002).

The discussion in *Cardiac Pacemakers* emphasized the importance of having top people on the legal research and writing tasks:

> CPI is also critical of the fact that the partners deigned to spend their time performing such supposedly lowly tasks as legal research and drafting briefs. CPI suggests that such efforts should be compensated at lower hourly rates. . . .
>
> The court views CPI's criticism as misguided, at least as applied to the tasks at issue in this case. The criticism reflects a persistent but not always accurate caricature of law practice in which senior partners do relatively little hands-on work while more junior minions do the bulk of the work. The criticism also tends to undervalue legal research and writing, which are often decisive,

34

especially when dealing with complex and unusual issues.

CPI's criticism also is not consistent with the eminently rational decisions that the sophisticated clients on both sides of this case made in staffing a case of great value and importance to all of them. "Markets know market values better than judges do." In re Continental Illinois Securities Litigation, 962 F.2d 566, 570 (7th Cir.1992). From the trial in this case, it is evident that the most senior lawyers on both sides were fully engaged in the case. That engagement requires knowing the law and the evidence, thoroughly and first-hand.

Indeed, not only is Mrs. Crandall not a paralegal, but the work she did in this case could not have been done by a paralegal, or even a "junior minion."

It is entirely proper for the Olson firm to charge a premium rate for Mrs. Crandall's services because she brings so much to the table not only as a legal researcher and writer, but as a trial consultant, a witness preparer and a case analyzer.  (Olson Dec. ¶¶ 2-13.)  As Affiant Michael R. Fox states, "Mrs. Crandall brings at least as much value to a litigation team as a professional trial consultant."   (Second Fox Affidavit at ¶ 11.)  Attorney Fox attaches to his affidavit a proposal he received some years ago from a trial consultant not licensed to practice law in Wisconsin whose services would not include anything Mrs. Crandall could not do and who charges $425 per hour for his services.  (*Id.*, Exh. A.)

Attorney Fox states that the research in his firm "has been consistently assigned to the brightest most experienced (30 plus years) researcher in the firm, because I believe that these issues require an exacting and wary intellect thoroughly schooled in the innumerable pitfalls of civil rights litigation."  (*Id.*, at

35

¶ 5.)  Of Mrs. Crandall, his former law partner, he says:

>   In the cases we handled as a team, Mrs. Crandall's participation was characterized by creativity and courage.   I have often described her to others as having an extraordinary gift for combining legal and factual analysis and, in the area of law that drew her interest, as the best case strategist I have ever known.   I continue to hold these opinions.

>   In my opinion, the $385 hourly rate at which the Olson Firm bills for Mrs. Crandall's services is reasonable because she brings at least that much value to the analysis of and preparation of civil rights cases.  She is a person who clients meet and trust and it is my informed opinion that attorneys pay  far more for far less "support service" purchased from non-practicing lawyers who market their services through litigation support operations.   Her rate is thus reasonable given her extraordinary skills tempered by her extraordinary experience.

>   In my opinion, Mrs. Crandall brings at least as much value to a litigation team as a professional trial consultant, and I am attaching hereto as Exhibit A a proposal I recently received in 2008 from a trial consultant not licensed to practice law in Wisconsin whose services would not include anything Mrs. Crandall could not do and who charges $425 per hour for his services.  I would not hesitate to engage this trial consultant at this rate in an important case, and if Mrs. Crandall were available, I would not hesitate to engage her at an hourly rate of the same order of magnitude.

>   I have found her insights as a consultant, based on her extensive experience as a successful trial attorney and her ability to strategize and to take maximum advantage of the elements of any case to be of the highest caliber.  She is, in my opinion, one of the most brilliant legal thinkers I have met during my career.  Her excellent tactical judgment makes her contribution to any case in which she is involved extremely valuable. Her rates are lower than those of consultants with comparable experience and skill; others charge as much as $ 600.00 an hour.

(*Id.*, at ¶¶ 25-28.)

**IX.** **The Court Should Determine the Fee Award Using Current Hourly Rates Rather than the Rates in Place when the Work was Done, in Order to Ensure that Plaintiff's Counsel is Compensated for Delay in Receiving Payment.**

In *Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 716, (1987), the Supreme Court mandated that attorneys fee awards under fee-shifting statutes be enhanced to compensate the prevailing attorneys for having to wait until the litigation is concluded, often a period of years, to get paid. Ever since, courts have uniformly enhanced attorneys fees awards to compensate the winning attorneys for delay in the receipt of payment, either by adding interest to billings from the past using rates current when the work was done, or, far more commonly because far easier to calculate, by simply basing a fee award on the attorneys' billing rates that are currently in force when the award is made. *Missouri v. Jenkins*, 491 U.S. 274, 283-284 (1989).

**A.** **The U.S. Supreme Court and Seventh Circuit award attorney's fees under 42 USC §1988 at current rates to compensate for the delay in receiving payment.**

Compensation for civil rights attorneys is customarily delayed until the very end of a case. Compensation for this delay is generally made "either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value." *Missouri v. Jenkins*, 491 U.S. 274, 282 (1989) (internal quotation marks omitted). The Court explicitly stated in *Jenkins* that adjusting the fee by applying the current rate was contemplated by the fee-shifting statute, 42 USC §1988. *Id.* at 284.

Since *Jenkins*, the Seventh Circuit has applied the current rate when

calculating attorney's fees pursuant to a §1988 petition. Summarizing sixteen

years of precedent, the court said in *Mathur v. Bd. of Trustees of S. Il. Univ.*:

> We have allowed district courts to use either current rates or past
> rates with interest when calculating the lodestar amount, see *Smith
> v. Village of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994), because either
> method provides "[a]n adjustment for delay in payment [which] is .
> . . an appropriate factor in the determination of what constitutes a
> reasonable attorney's fee. . . ." *Missouri v. Jenkins by Agyei*, 491 U.S.
> 274, 284, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); see also
> *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S.
> 711, 716, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987); *Soto v. Adams Elevator
> Equip. Co.*, 941 F.2d 543, 553 (7th Cir. 1991).

*Mathur*, 317 F.3d 738, 744-745 (7th Cir. 2003). See also *Lightfoot v. Walker*, 826 F.2d

516, 523-524 (7th Cir. 1987) ("To compensate for the delay in payment and to

simplify its calculation, courts often calculate fee awards using current market

rates as opposed to historic rates.")

Although there are two permissible means for adjusting the billing rates to

account for delays, case law in Seventh Circuit case law supports the method of

paying fee awards at the attorneys' current billing rates. *Greenfield Mills, Inc. v.

Carter*, 569 F. Supp. 2d 737, f. 22 (N.D. Ind. 2008); citing *Trustees of Chicago

Plastering Institute Pension Trust v. Cork Plastering Inc.*, 2008 WL 728897, 2 (N.D.

Ill. 2008).

**B.     Compensation for delay in payment arises out of the business reality that plaintiff's firms bear the expense and uncertainty of awaiting the future payment of attorney's fees.**

The U.S. Supreme Court, in *Pennsylvania v. Del. Valley Citizens' Council*, 483 U.S. 711, 716 (1987) explained why attorney's fees should be paid at current rates at the conclusion of litigation:

> First is the matter of delay. When plaintiffs' entitlement to attorney's fees depends on success, their lawyers are not paid until a favorable decision finally eventuates, which may be years later, as in this case. Meanwhile, their expenses of doing business continue and must be met. In setting fees for prevailing counsel, the courts have regularly recognized the delay factor, either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value. See, e.g., *Sierra Club v. EPA*, 248 U.S.App.D.C. 107, 120-121, 769 F.2d 796, 809-810 (1985); *Louisville Black Police Officers Organization, Inc. v. Louisville*, 700 F.2d 268, 276, 281 (CA6 1983).

*Id*. See also *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (adopting this language as more than dicta).

The question before the Court in *Deleware Valley Citizen's Council* was whether the lodestar amount should be multiplied in order to reward plaintiff's attorneys who take on difficult civil rights cases on a contingency basis. 483 U.S. 711, 716 (1987) (plurality decision). Although the Court ultimately decided not to apply a multiplier for contingency, the Court also emphasized that it was entirely proper that civil rights attorneys be compensated for having to wait until after the end of a case to be paid. See *id*.

### X. The Court Should Make No Post-Lodestar Reduction in the Fee Award to Account for the Result Obtained.

"Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2004 WI 112, ¶ 43, 275 Wis.2d 1, 24, 683 N.W.2d 58, quoting *Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983). "Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." *Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983). The Plaintiffs have proven that their rights were violated. The jury's award of damages is substantial. The Plaintiffs have, in short, achieved all the relief the law allows to one injured as they were injured. This result should merit a fully compensatory fee award.

### A. In this Case, a Post-Lodestar *Hensley* Reduction for "Results Obtained" is not Appropriate.

After the computation of the lodestar fee, through multiplying the claimant's attorney's hourly rate by the number of hours reasonably invested in the case, it is available to a court to reduce or enhance the lodestar to account for the result obtained in the litigation. This principle was first established in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), but as demonstrated above the Court very shortly was warning that such post-lodestar adjustments should be exceedingly rare. By one year after *Hensley*, in *Blum v. Stenson*, 465 U.S. 884 (1984), the Court was prepared to say that the lodestar is presumed to be the appropriate fee award, and by two years after

that the Court emphasized the "strong presumption" that the lodestar will fully reflect the result obtained and not be adjusted after calculation to account therefor. *Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546 (1986).

Subsequently, courts have properly departed from the lodestar calculation only in extraordinary circumstances. Even though certain related claims were lost in *Graham v. Sauk Prairie Police Commission*, 915 F.2d 1085, 1109 (7th Cir. 1990), for example, the Court declined to reduce the lodestar based on the results obtained. In *Casey v. City of Cabool, Missouri*, 12 F.3d 799, 806 (8th Cir. 1993), no reduction in the lodestar was found appropriate even though related claims were lost. See also, *Soto v. Adams Elevator Equipment Co.*, 941 F.2d 543, 52 (7th Cir. 1991) (no reduction for loss of related claims); and *Nanetti v. University of Illinois*, 944 F.2d 1416, 1419 (7th Cir. 1991) (same). In *Flitton v. Primary Res. Mort.*, 614 F.3d 1173 (10th Cir. 2010), the Tenth Circuit considered an award of $367,689.00 in attorney's fees based on a recovery of $354,703.05 in back pay and affirmed the district court's decision that no reduction in the lodestar fee was called for despite the fact that the plaintiff had prevailed only on a discrimination claim while losing a retaliation claim, and failing to recover requested punitive damages, and had apparently admitted to, at some point, seeking $27,902,065.58 in damages.

It is probably fair to say that most courts today find their most useful guidance in the following language from *Hensley*:

> We agree with the district court's rejection of "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon." Such a ratio provides little aid in

determining what is a reasonable fee in light of all the relevant factors. Nor is it necessarily significant that a prevailing plaintiff did not receive all the relief requested. For example, a plaintiff who failed to recover damages but obtained injunctive relief, or vice versa, may recover a fee award based on all hours reasonably expended if the relief obtained justified the expenditure of attorney time.

*Hensley v. Eckerhart*, 461 U.S. 424, 435, n.12.

Post-lodestar reductions based on results obtained are often misunderstood. As shown above, they are not appropriate for the purpose of bringing a fee award closer to the amount of damages awarded to a successful claimant. The fact that a lodestar fee is larger than the amount of monetary compensation awarded to the claimant is "not a reason to reduce a fee below an amount that represents a reasonable hourly rate for a reasonable number of hours expended." *Lynch v. Crossroads Counseling Center, Inc.,* 2004 WI App 114, ¶ 46, 275 Wis.2d 171, 684 N.W.2d 141. Nor is a post-lodestar reduction for results obtained appropriate because a claimant made unsuccessful arguments or claims. This would, as shown above, discourage aggressive and creative lawyering.

In this case, for example, there should be no post- lodestar reduction for the loss of related claims. Not only were these claims related on the facts and the law to the successful claim, but winning the claims relating to the City's tavern-amusement licensing scheme would not have resulted in any discrete compensation for the Plaintiffs, as their candid admission has always been that they never would have opened more than one downtown club, and they have already received damages for their inability to open such c club.

If post-lodestar reductions for "results obtained" are not appropriate to bring an attorneys' fees award more in line with the damages awarded the Plaintiffs or to account for lost arguments or claims, what are they to account for? The answer can be found in the origin of the concept, the list of factors relevant to the amount of a reasonable attorneys' fee in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-719, (5th Cir. 1974):

> The 12 factors are: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and **the results obtained**; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. These factors were taken from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2-106 (1980).

*Pennsylvania v. Del. Valley Citizens' Council*, 478 U.S. 546, 562, n. 7 (1986)(emphasis supplied).

Most of these factors relate either to the *quantit*y or the *quality* of legal services rendered, or to how burdensome it was to provide them. Thus, it remains available to impose a post-lodestar reduction for "results obtained," if a result, while qualifying the plaintiff as a "prevailing party," is not as successful as other lawyers might have achieved in the same case, for reasons related to the quantity or quality or intensity of the legal efforts exerted by counsel. Plaintiffs' counsel trust the Court cannot make such a finding in the case at bar.

**B.** **It Does Not Make Any Sense to Penalize a Litigant for Mentioning a Damages Figure only in Closing Argument, or to give Plaintiff's Lawyers an Economic Incentive to Sell Their Damages Claims Short in Closing Argument.**

As the Seventh Circuit pointed out in *Jaffee v. Redmond*, 142 F.3d 409 (7th Cir. 1998), courts should avoid any approach to deciding attorneys' fees applications that would place 42 U.S.C. § 1988 at odds with the precepts of legal ethics requiring zealous advocacy:

> We have recognized previously that § 1988's overriding goal was to reimburse with a reasonable attorneys' fee those who as 'private attorneys general' take it upon themselves to invoke and thereby invigorate federal constitutional and statutory rights. If arguments that do not contribute to a plaintiff's ultimate success were not eligible for compensation for that reason alone, then **attorneys might be discouraged from raising novel but reasonable arguments in support of their clients' claims and a disincentive for strong advocacy could result. The ethics of the legal profession counsel an opposite approach.** A lawyer who figures out the likeliest outcome in his favor, and aims only for that, is likely to fall short. **The good lawyer aims higher, and is not improvident to do so.**

*Id.* at 417 (internal citations and quotation marks omitted, emphasis supplied).

Concededly, the Seventh Circuit has sometimes made reference to figures lawyers requested in closing argument, *e.g.*, *Briggs v. Marshall,* 93 F.3d 355, 361, (7th Cir. 1996), *Hyde v. Small*, 123 F.3d 583, 585 (7th Cir.1997)( "the brevity of the trial and the fact that Hyde's lawyer did not ask the jury to award a specific amount suggest that he was not aiming for the big bucks."), but the Supreme Court has never determined "the level of a plaintiff's success," *Hensley v. Eckerhart*, 461 U.S. 424, 430 (1983), by reference to a figure mentioned only in

closing argument.

### XI. Litigation Expenses that an Attorney Would Ordinarily Bill to a Paying Client Are Recoverable in Connection With an Attorneys' Fees Award under Ordinary Fee-Shifting Statutes.

Expenses that would ordinarily be billed to a client are a legitimate part of an attorneys' fees claim under 42 U.S.C. § 1988 and other fee-shifting provisions. *Henry v. Webermeier*, 738 F.2d 188, 192 (7th Cir. 1984). "[C]ounsel should generally be compensated for reasonable expenses such as travel, telephone charges, photocopies and the like." *Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 440 (7th Cir. 1992). "Section 1988 has been construed to encompass the reimbursement of all reasonable out-of-pocket expenses incurred by the prevailing party. As pointed out in [*Henry v. Webermeier id.*] the Act seeks to shift the cost of the winning party's lawyer to the losing party and the costs include out-of-pocket expenses for which lawyers normally bill their paying clients separately." *Alexander v. City of Milwaukee*, 2006 WL 277114, at *9 (E.D. Wis. 2006) In this case the Plaintiffs seeks an award of out-of-pocket litigation expenses in conjunction with their § 1988 attorneys' fees motion.

### CONCLUSION

The Court should order payment of attorneys' fees and costs in the amounts sought.

Dated this Monday, April 20, 2015.

Respectfully submitted,

Six Star Holdings, LLC, and Ferol, LLC,

Plaintiffs,

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
131 West Wilson Street, Suite 1200
Madison, WI 53703
Phone          608/283-6001
Fax             608/283-0945
Email:         jsolson@scofflaw.com

/s/ Jeff Scott Olson
_____

Jeff Scott Olson
ATTORNEY FOR PLAINTIFFS

### Certificate of Service

I hereby certify that on Monday, April 20, 2015, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Assistant City Attorneys Adam B. Stephens and Stuart Mukamal, Attorneys for the Defendant, and I hereby certify that I have mailed by United States Postal Service the document to the following non ECF participants: none.

/s/ Jeff Scott Olson

46