UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**SIX STAR HOLDINGS, LLC**
**and FEROL, LLC**
        Plaintiffs,

   v.                                           Case No. 10-C-0893

**CITY OF MILWAUKEE**
        Defendant.

---

## DECISION AND ORDER

Plaintiffs Six Star Holdings, LLC, and Ferol, LLC, brought this lawsuit under 42 U.S.C. § 1983 and alleged that several City of Milwaukee ordinances regulating erotic dance entertainment were unconstitutional. On February 19, 2015, I entered a judgment in favor of the plaintiffs. The judgment awarded Ferol money damages in the amount of $435,500 and awarded Six Star nominal damages in the amount of $1.00. Following the entry of judgment, the plaintiffs filed a motion for attorneys' fees and costs under 42 U.S.C. § 1988 and Federal Rule of Civil Procedure 54(d). Below, I address that motion and the plaintiffs' motion for supplemental attorneys' fees and costs, which requests that the award include the fees incurred in filing the fee petition.[1]

## I. BACKGROUND

---

[1] The City, in its brief in opposition to the plaintiffs' motion for attorneys' fees, argues, among other things, that the judgment in favor of Ferol is void because Ferol lacked standing to bring the claim for damages on which it ultimately prevailed. See Br. in Opp. at 8–11, ECF No. 154. This argument relates to aspects of this case that are involved in the City's pending appeal rather than to the plaintiff's request for a fee award. I thus lack jurisdiction to consider that argument, see, e.g., Kusay v. United States, 62 F.3d 192, 193–94 (7th Cir. 1995), and will not consider it.

The plaintiffs are two corporate entities controlled by Jon Ferraro and his partners. These individuals operate three gentlemen's clubs in Wisconsin, including one in the City of Milwaukee. Since at least 2009, they have been trying to open a second gentlemen's club in the City of Milwaukee, located downtown or near downtown. (Their existing Milwaukee location is not near downtown.) Six Star and Ferol are entities that they formed for the purpose of operating a downtown club. Each entity signed a lease for premises in or near downtown.[2] In order to offer erotic dance entertainment at these locations, the plaintiffs had to obtain appropriate licenses from the City. In 2010, after applying for and failing to obtain some of the necessary licenses, the plaintiffs commenced this suit, alleging that the City's ordinances requiring licenses to operate gentlemen's clubs were unconstitutional.

The licenses that Six Star and Ferol applied for in 2010 were tavern and tavern-amusement licenses. If the plaintiffs had obtained these licenses, they would have been able to both serve alcoholic beverages and offer erotic dance entertainment. When the plaintiffs filed their complaint in 2010, they challenged the ordinances that required a gentlemen's club to obtain these licenses. However, the complaint also included allegations relating to a City ordinance that governed "adult entertainment establishments." The plaintiffs believed that if they wanted to operate a "dry" gentlemen's club—one that offered erotic dance entertainment but did not serve alcohol—they would have to apply for a license under that ordinance. Therefore, in addition to challenging the tavern ordinances, they alleged that the ordinance governing adult entertainment establishments was unconstitutional. However, I dismissed the complaint's allegations relating to adult

---

[2]Throughout the litigation, I referred to Six Star's location as the "Old World Third" location and to Ferol's location as the "Pittsburgh Avenue" location.

entertainment establishments on the ground that the plaintiffs had not adequately alleged that they had any intent to open dry clubs and therefore had not shown that they had standing to challenge the ordinance. See Order on Mot. to Dismiss, ECF No. 18.

Following my order, the plaintiffs amended their complaint to allege that, while they preferred to operate clubs that served alcoholic beverages, they would immediately open dry clubs if the City's ordinances governing such clubs were declared unconstitutional. By this time, the City had repealed the ordinance governing adult entertainment establishments. However, the City still had ordinances on the books that appeared to require a club that did not serve alcohol to obtain a license if it wanted to offer erotic dance entertainment. These ordinances regulated "theaters" and "public entertainment clubs." In September 2011, Six Star applied for a license under the theater ordinance. The City never acted on that application.

In February 2012, Six Star and Ferol filed an amended and supplemental complaint that challenged the theater and public entertainment club ordinances, as well as continued to challenge the tavern and tavern-amusement ordinances. However, in March 2012, the City repealed the theater, public entertainment club, and tavern-amusement ordinances and at the same time enacted a new ordinance governing "public entertainment premises." The plaintiffs did not amend their complaint to include a challenge to the new ordinance, and thus the case went forward as a challenge to the former ordinances.[3] Because the ordinances had been repealed, the plaintiffs were seeking only damages for lost profits during the time when the ordinances were in force.

---

[3] The plaintiffs would later file a separate lawsuit challenging the ordinance regulating public entertainment premises. That lawsuit is pending.

3

Case 2:10-cv-00893-LA   Filed 10/05/15   Page 3 of 18   Document 165

On March 18, 2013, I decided the parties' cross-motions for summary judgment. See Six Star Holdings v. City of Milwaukee, 932 F. Supp. 2d 941 (E.D. Wis. 2013). I found that the City's tavern-amusement ordinance was constitutional and dismissed the plaintiffs' claims based on that ordinance. However, I found that the City had violated Six Star's rights by failing to render a prompt decision on Six Star's application for a theater license. Thus, I entered summary judgment as to liability on Six Star's claim for the lost profits it would have earned had it been able to operate a dry gentlemen's club prior to the ordinance's repeal. As to Ferol, I determined that the record did not contain an affidavit or other evidence showing that Ferol intended to operate a dry gentlemen's club prior to the repeal of the theater and public entertainment club ordinances. Thus, I again questioned whether Ferol had standing to challenge the ordinances governing dry clubs. However, I granted Ferol leave to supplement the record with an appropriate affidavit.

Following my decision, Jon Ferraro filed a declaration stating that, but for the existence of the theater and public entertainment ordinances, Ferol would have opened a dry gentlemen's club at its leased premises in 2010, immediately after the City denied its applications for tavern licenses. The parties then briefed the issue of whether Ferol had standing to pursue damages for the period between 2010 and March 2012 and, if so, whether Ferol was entitled to summary judgment as to liability. In August 2013, I issued a decision in which I found that Ferol had standing to pursue damages and that the theater and public entertainment club ordinances were unconstitutional as applied to Ferol. See Order of Aug. 28, 2013, ECF No. 87. I then set the matter for a jury trial.

Prior to trial, the plaintiffs decided that if the City's ordinances governing dry clubs had not been in force between 2010 and 2012, they would not have opened gentlemen's clubs

4

at both the Pittsburgh Avenue location and the Old World Third location. Rather, they would have opened only a single club at the location they thought would be more profitable. This would have been the Pittsburgh Avenue location, i.e., at the premises that Ferol had leased. Thus, only Ferol's claim for lost profits proceeded to trial. At the trial, the jury was asked to answer two questions: (1) But for the theater and public entertainment club ordinances, would Ferol have opened a dry gentlemen's club at its leased premises before those ordinances were repealed in March 2012? And (2) if so, what amount of profit would Ferol have earned had it been able to open such a club during that time period? The jury returned a verdict in favor of Ferol, concluding that it would have opened a dry club prior to the ordinances' repeal and that it suffered lost profits in the amount of $435,500. After the trial, I entered judgment in favor of Ferol in accordance with the verdict and also entered judgment in favor of Six Star for nominal damages based on its successful challenge to the theater ordinance.

The plaintiffs now move for attorneys' fees for all of the work that their attorneys performed on behalf of Ferol and Six Star throughout this case. They also seek costs that are taxable under 28 U.S.C. § 1920 and reimbursement for certain litigation expenses that are not otherwise taxable as costs.

## II. DISCUSSION

Under 42 U.S.C. § 1988, a "prevailing party" in litigation under § 1983 may recover a "reasonable attorney's fee." Both Ferol and Six Star are "prevailing parties" under § 1988—Ferol because it obtained a $435,500 jury verdict, and Six Star because it prevailed on its challenge to the theater ordinance and obtained nominal damages. See Farrar v. Hobby, 506 U.S. 103, 112 (1992); Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). To

5

determine the "reasonable" fee to which a prevailing party is entitled, a district court generally begins by computing a "lodestar": the product of the hours reasonably expended on the case multiplied by a reasonable hourly rate. See, e.g., Montanez v. Simon, 755 F.3d 547, 553 (7th Cir. 2014). Although the lodestar yields a presumptively reasonable fee, the court may adjust the fee based on factors not included in the computation. Id.

**A.   Lodestar Calculation**

**1.   Reasonable hourly rate**

The plaintiffs were represented by The Jeff Scott Olson Law Firm. Several professionals at that firm billed time to the case: lead counsel Jeff Scott Olson, "trial consultant" Sara Furey Crandall (who is also an attorney), associate attorney Andrea Farrell, and several law clerks and paralegals. The plaintiffs contend that the reasonable hourly rates for these professionals are as follows: $575 for Olson, $385 for Crandall, $350 for Farrell, and $150 for law clerks and paralegals.

A reasonable hourly rate is one that is derived from the market rate for the services rendered. Pickett v. Sheridan Health Care Ctr., 664 F.3d 632, 640 (7th Cir. 2011). "The best evidence of an attorney's market rate is his or her actual billing rate for similar work." Johnson v. GDF, Inc., 668 F.3d 927, 933 (7th Cir. 2012). Jeff Scott Olson has submitted a declaration in which he states that the above rates are the standard rates that his firm collects from all clients who pay on an hourly basis rather than through contingency fees. Olson Decl. ¶¶ 7–17, ECF No. 140. He states that a large portion of the firm's income is derived from hourly billing. Id. ¶ 16. Further, several of the firm's paying clients, including Jon Ferraro and other owners of gentlemen's clubs in Wisconsin, have submitted

6

Case 2:10-cv-00893-LA   Filed 10/05/15   Page 6 of 18   Document 165

declarations in which they state that they pay the Olson firm's standard hourly rates. Decl. of Jon Ferraro ¶¶ 5–8, ECF No. 143; Decl. of Gerald Morrell ¶¶ 3–10, ECF No. 144; Decl. of Diane Schwartz ¶¶ 2–7, ECF No. 145. The City does not suggest that these rates were paid in cases in which the Olson firm's work was dissimilar to the work that it performed in this case. Thus, based on these declarations, I conclude that the Olson firm's requested rates are the market rates for the firm's services in federal civil-rights litigation.[4]

The City argues that the Olson's firm's rates are excessive because a survey conducted by the State Bar of Wisconsin found that, in 2012, the average hourly rate for "tort/personal injury" lawyers was $207 and the 95th-percentile hourly rate for all private practitioners in Wisconsin was $395. See State Bar of Wisconsin, 2013 Economic of Law Practice in Wisconsin 35, 39 (2013); ECF No. 155-1. But again, the "best evidence" of an attorney's reasonable rate is the rate paid by actual clients for similar work. Johnson, 668 F.3d at 933. As discussed, the evidence shows that clients pay the Olson firm's standard rates, and the City has not shown that the matters in which they did so were dissimilar to this case. Moreover, the survey reflects rates from 2012 rather than 2015, and it does not contain any information as to the rates charged by attorneys who specialize in civil-rights litigation, as do the plaintiffs' attorneys in this case. Thus, the survey evidence does not undermine the conclusion that the Olson firm's rates are reasonable.

Next, the City argues that the plaintiffs are not entitled to recover fees for the work of the Olson firm's trial consultant, Sara Furey Crandall, because she is no longer licensed to

---

[4] The plaintiffs have also submitted declarations from other civil-rights attorneys who opine that the Olson firm's rates are reasonable. See ECF Nos. 146–50. These declarations bolster the conclusion that the Olson firm's rates are reasonable.

practice law in Wisconsin (or in any other state). Crandall graduated cum laude from the University of Wisconsin Law School in 1977 and was admitted to the Wisconsin bar that same year. Crandall Decl. ¶ C, ECF No. 142. She maintained a private practice in Wisconsin from 1977 to 1992. Id. ¶¶ D–J. In 1992, Crandall moved to Maine, went on "inactive" status with the Wisconsin bar (her license would expire in 1995), and intended to give up the active practice of law. Id. ¶¶ J, P. However, that same year, she began working intermittently for Jeff Scott Olson, on a freelance basis, doing legal research, case analysis, and legal writing for him on civil rights cases. Id. ¶ O. In 2001, she began working for the Olson firm full time, and she has continued to do so to the present. Id. ¶ Q Her role at the firm is to develop trial and pretrial strategies, prepare witnesses, perform legal writing and complex legal research tasks, and assist Jeff Scott Olson in trial preparation. Id. ¶ A. In the present case, Crandall performed legal research and writing for the plaintiffs, and she was responsible for planning the plaintiffs' trial strategy. Olson Decl. ¶ 30. However, all of her work was subject to the supervision of Attorney Olson, and all final work product was his. Id.

The Supreme Court has held that § 1988 allows a plaintiff to recover fees at market rates for the services of paralegals and law clerks—i.e., persons who assist the plaintiffs' attorney but do not possess law licenses. Missouri v. Jenkins, 491 U.S. 274, 284–89 (1989). Given this, there is no reason why the fees of an attorney who does not maintain an active law license but who has assisted another attorney who does should not be recoverable under § 1988. The City contends that Crandall's work on this case amounted to practicing law without a license, in violation of Wisconsin law. See Wis. Stat. § 757.30. However, I doubt that that is true, since all of Crandall's work was supervised by Olson and was

incorporated into his final work product.  See Olson Decl. ¶ 30.  But even if that is true, I do not see how it is relevant to whether her work is compensable under § 1988.  It is up to the state authorities and the state judicial system to determine whether a person has practiced law without a license and, if they determine that the person has done so, to decide on the appropriate penalty.  These are not matters for a federal judge to perform when ruling on a fee petition under § 1988, and thus the judge should not refuse to award fees to an unlicensed attorney who assisted a licensed attorney as a penalty for violating state law.[5]  Accordingly, the plaintiffs are entitled to have Crandall's work included in their fee award.

The City also argues that Crandall's hourly rate, $385, is excessive because her work should be considered that of a paralegal and $385 per hour is an excessive rate for a paralegal.  But Crandall's work went beyond that of a paralegal.  As discussed, she performed legal research and writing and planned the plaintiffs' trial strategy.  These are not tasks normally assigned to a paralegal.  Moreover, unlike a typical law clerk or paralegal, Crandall is a specialist in the area of civil rights law and has special expertise in legal research and trial planning in that area.  See Olson Decl. ¶¶ 32–33.  In any event, fees for those who assist the plaintiffs' licensed attorney are awarded at market rates, Jenkins, 491 U.S. at 289, and the evidence in this case shows that, however Crandall's work is characterized, the market rate for her work is $385 per hour.  That is the rate that the Olson

---

[5]Of course, a federal judge can prevent an unlicensed attorney from appearing before the court in the first place.  See, e.g., Gen. L.R. 83(b) (E.D. Wis. 2015) (requiring all attorneys appearing in Eastern District of Wisconsin to be admitted to practice).  Thus, my conclusion that an unlicensed attorney may be compensated for assisting a licensed attorney should not be construed to mean that an unlicensed attorney could represent a plaintiff in federal court by him or herself and obtain an attorneys' fee under § 1988.

firm's clients actually pay for Crandall's work in similar cases.  See Ferraro Decl. ¶ 8; Morrell Decl. ¶ 10; Schwartz Decl. ¶ 7.

The City points out that one of the reasons for allowing a plaintiff to recover fees for paralegals and law clerks is that it leads to cost savings, as normally paralegals and law clerks will have lower billing rates than the attorney who otherwise would have performed the work.  See Jenkins, 491 U.S. at 288.  The City contends that allowing an unlicensed lawyer to recover $385 per hour undermines this cost-savings rationale.  But Crandall's rate is nearly $200 lower than Olson's, and much of the work she performed would otherwise have been performed by him.  See Reply Br. at 20, ECF No. 156.  Thus, the firm's use of Crandall's services did lead to cost savings.  Of course, Crandall's rate is higher than the rates of the Olson firm's paralegals and law clerks, but as just discussed, she performed work that is beyond the capabilities of a typical paralegal or law clerk and has special expertise in the area of civil-rights law.  Thus, it was reasonable for the Olson firm to charge a higher rate for her services, as is confirmed by the fact that the firm's clients actually pay that rate.  Accordingly, I conclude that Crandall's hourly rate is reasonable.

**2.     Reasonable number of hours**

I next examine whether the number of hours expended on this case was reasonable.  The Olson firm spent a total of 1,032.8 hours on this matter.  Olson expended 256.7 hours on the case, Attorney Farrell expended 67.3, Attorney Crandall expended 645.4, and law clerks and paralegals expended 63.4.

The City argues that the Olson firm should not be paid for "those billing entries which reflect duplicative work unnecessarily performed by both an attorney and the trial consultant." Br. in Opp. at 18, ECF No. 154.  However, the City does not identify any specific billing

10

entries in the plaintiffs' 61 pages of billing records that it contends is duplicative. It is of course not my job to scour these records to identify entries that might be duplicative; it is up to the losing party to bring any potentially duplicative entries to the court's attention. See Moreno v. City of Sacramento, 534 F.3d 1106, 11116 (9th Cir. 2008) (stating that in fee litigation, the losing party has the burden of "point[ing] out such things as excessive or duplicative billing practices"); Thornton v. M7 Aerospace LP, 796 F.3d 757, 769 (7th Cir. 2015) (district court not required to scour the record to find evidence supporting party's argument). Because the City has not carried its burden to identify any potentially duplicative entries, I will not strike any entries on that ground.

Next, the City contends that four of Crandall's billing entries (comprising 11.7 hours) should be struck from the fee request because they represent time spent driving between Madison (where the Olson firm's offices are located) and Milwaukee. However, it is presumed that a reasonable fee includes reasonable travel time billed at the same hourly rate as normal working time. Henry v. Webermeier, 7738 F.2d 188, 194 (7th Cir. 1984). The City has not attempted to rebut this presumption. It does not, for example, contend that the travel was unnecessary or that the work that Crandall performed in Milwaukee was unnecessary or excessive. See Br. in Opp. at 19. Thus, I will not strike the disputed entries.

The City also contends that the plaintiff's motion for supplemental attorneys' fees—which is for the most part a request for the fees incurred in preparing the fee petition—should be denied. However, the City acknowledges that a prevailing party is entitled to recover the fees reasonably incurred in filing the fee petition. ECF No. 160 at 1 (citing Robinson v. City of Harvey, 617 F.3d 915, 918 (7th Cir. 2010)). The City does not identify any billing entries in the supplemental motion that might represent time not

11

reasonably expended on litigating the fee request. Still, in reviewing the billing records submitted with the motion for supplemental fees, I noticed that some of the entries for Attorney Olson's time reflect work performed in connection with the pending appeal. See ECF No. 159-2 (entries for March 20, 23, 26, 27, 30 (0.1 entry) & 31 (0.3 and 0.1 entries), April 6 (0.2 entry), 22 & 30, and May 1 & 28). Although the City has not asked to have these entries excluded from the fee award, I will exclude them on the ground that the plaintiffs have not yet prevailed on appeal and thus are not yet entitled to an award of fees for work performed in connection with the appeal. The entries attributable to the appeal amount to 6.8 hours of Olson's time at a rate of $575 per hour. Thus, the total fee award will be reduced by $3,910.[6] However, all of the time spent on the fee petition will be included in the award.

### 3. Lodestar amount

After the reduction for work performed by Attorney Olson in connection with the appeal, the total lodestar amount for attorneys' fees in the district court is $425,553.50.

### B. Adjustments to Lodestar for Results Obtained

After calculating the lodestar, a district court may consider other factors to determine whether to adjust the fee award upward or downward. Hensley, 461 U.S. at 434. One such factor relates to the "results obtained." Id. This factor is relevant where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were

---

[6]If the plaintiffs prevail on appeal, they may at that time reapply for these fees, along with any other fees reasonably incurred on appeal. See, e.g., Jannotta v. Subway Sandwich Shops, Inc., 225 F.3d 815, 819–20 (7th Cir. 2000).

unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award? Id. Importantly, "[a] plaintiff who brings multiple theories to remedy the same harm is not to be penalized just because some, or even all but one, are rejected, provided that the one or ones that succeed give him all that he reasonably could have asked for." Montanez, 755 F.3d at 556 (internal quotation marks omitted). Accord Hensley, 461 U.S. at 435 (stating that, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," even if the court rejected or did not reach alternative legal theories for the same relief).

In the present case, the plaintiffs succeeded on their challenge to the former City ordinances applicable to dry gentlemen's clubs but did not succeed on their challenge to the former City ordinances applicable to gentlemen's clubs that serve alcohol. However, these claims were related, in that they both sought the same result: lost-profits damages for the time period prior to the ordinances' repeal in which the plaintiffs could not operate a gentlemen's club at one of their locations. Thus, the challenges to the various ordinances are best viewed as alternative legal theories rather than distinct claims. See Lindh v. Murphy, 96 F.3d 856, 874 (7th Cir. 1996) ("A 'claim' is a demand for relief from an identified injury, which may be supported (or defeated) by many different theories."). Here, the overall claim was for lost profits for the period in which, but for the City's regulation of erotic dance entertainment, the plaintiffs were unable to operate a gentlemen's club. The plaintiffs prevailed on that claim and obtained an excellent result—a judgment for damages in the amount of $435,500. The fact that the plaintiffs did not prevail on their challenge to the former tavern ordinances does not detract from this level of success. Indeed, the City has

13

not called my attention to evidence in the record supporting the conclusion that the jury's verdict would have been greater had the plaintiffs been able to serve alcohol during the relevant time period. Moreover, a judgment in the amount of $435,500 cannot be described as "a minimal victory in light of the time expended to achieve it." Montanez, 755 F.3d at 556. Thus, I conclude that the lodestar should not be reduced under the "results obtained" factor.

The City argues that "at a minimum, all fees claimed prior to the drafting of [the] Fourth Amended Complaint on November 1, 2011 should be disregarded." Br. in Opp. at 16, ECF No. 154. The Fourth Amended Complaint was the operative complaint at the time of trial and alleged claims for damages in connection with the former tavern, theater, and public entertainment club ordinances. The basis for the City's argument for not awarding the fees incurred prior to the drafting of this complaint seems to be that, in earlier complaints, the plaintiffs alleged claims that they would later abandon—namely, a claim for injunctive relief and a challenge to the ordinance governing "adult entertainment establishments." However, the challenge to the ordinance governing adult entertainment establishments was part of the overall challenge to the City's regulation of dry gentlemen's clubs, which is the claim on which the plaintiffs ultimately prevailed. Although the plaintiffs abandoned their challenge to that particular ordinance, they obtained all of their requested relief through their challenge to the theater and public entertainment club ordinances. As for the request for an injunction, the plaintiffs abandoned that request only because the City repealed the challenged ordinances, thereby rendering their request for an injunction moot. So the plaintiffs cannot be thought to have achieved "only partial or limited success," Hensley, 461 U.S. at 436, because they did not obtain an injunction or secure a judgment stating that the ordinance governing adult entertainment establishments was unconstitutional. Indeed,

14

because the City repealed the challenged ordinances in response to the plaintiffs' suit, in some sense the plaintiffs did succeed on these claims. In any event, most, if not all, of the work that the plaintiffs' lawyers performed before they drafted the Fourth Amended Complaint related to the claim for damages on which they ultimately prevailed: the challenge to the ordinance governing adult entertainment establishments was part of the overall challenge to the City's regulation of dry gentlemen's clubs, the plaintiffs' request for injunctive relief was based on the same facts and legal theories as their request for damages, and the City has not pointed to any time entries included in the lodestar that relate solely to the plaintiffs' request for an injunction or their challenge to the ordinance governing adult entertainment establishments. Thus, I conclude that all of the work that the plaintiffs' performed prior to drafting the Fourth Amended Complaint was related to their ultimately successful claim for damages and, for that reason, should be included in the fee award.

**C.	Nominal Damages**

The City argues that because Six Star obtained only nominal damages, it should not receive a fee award. A plaintiff who brings a § 1983 claim and wins only nominal damages is a "prevailing party" under § 1988 and thus is eligible for a fee award. Farrar v. Hobby, 506 U.S. 103 (1992). However, a "reasonable" attorneys' fee for a nominal victor is usually zero. Id. at 115.

Here, it is true that Six Star did not obtain anything other than nominal damages. But that is because the owners of both Six Star and Ferol intended to open only a single downtown gentlemen's club and decided that opening the club at Ferol's leased premises would have been more profitable than opening it at Six Star's leased premises. Thus, at trial, they focused on the profits that Ferol would have made had the City's unconstitutional

15

ordinances not prevented it from opening a gentlemen's club at the Pittsburgh Avenue location. All of the work that the plaintiffs' lawyers performed prior to trial was related to the claims of both Ferol and Six Star: both plaintiffs claimed that the same ordinances were unconstitutional, and for the same reasons. It is thus difficult to identify any work that the lawyers performed solely on behalf of Six Star and could be excluded from the fee award on the ground that Six Star earned only a nominal victory. Indeed, the City has not pointed to a single time entry that represents work performed on behalf of Six Star that did not also benefit Ferol. Really, all of the work on this case was focused on the same goal: obtaining lost-profits damages on behalf of one of the plaintiffs for the time in which the unconstitutional ordinances prevented either plaintiff from operating a gentlemen's club. And, as discussed above, the plaintiffs achieved that goal and therefore are entitled to the full lodestar amount. Thus, the fee award will not be reduced on the ground that Six Star obtained only nominal damages.[7]

**D.    Costs and Out-of-Pocket Expenses**

The plaintiffs' motion for attorneys' fees includes a request for costs that are taxable under 28 U.S.C. § 1920 as well as a request for reimbursement of out-of-pocket expenses that are not taxable under § 1920. These latter expenses include things such as travel expenses and expert-witness fees. The total request for costs and out-of-pocket expenses

---

[7]Technically, I suppose I could deny Six Star's request for attorneys' fees on the ground that it obtained only nominal damages and award the full lodestar amount to Ferol on the ground that all of the plaintiffs' lawyers' work in this case was reasonably expended on Ferol's claim. The City's liability for attorneys' fees would be the same, except that its liability would run to Ferol only. However, I do not see any practical difference between awarding the full lodestar amount to both plaintiffs and awarding that same amount to Ferol only. Thus, I will award the full lodestar amount to the plaintiffs jointly, which is what the plaintiffs have requested.

16

is $57,033.07. The City does not dispute that the plaintiffs are entitled to statutory costs. However, the City contends that the plaintiffs are not entitled to reimbursement for out-of-pocket expenses that are not taxable under § 1920.

In Henry v. Webermeier, the Seventh Circuit held that the term "attorney's fee" in § 1988 includes out-of-pocket expenses, such as those incurred for investigation, travel, and other activities related to case preparation, that a lawyer would normally bill to a client separately rather than include in his or her overhead. 738 F.2d 188, 191–92 (7th Cir. 1984). Thus, under Henry, a prevailing party is entitled to recover such expenses under § 1988 provided that they are reasonable.

In arguing that the plaintiffs are not entitled to recover their out-of-pocket expenses, the City cites West Virginia University Hospitals, Inc. v. Casey, in which the Supreme Court held that § 1988 does not allow a court to include expert-witness fees in the attorneys' fee award. 499 U.S. 83, 102 (1991). However, in Casey, the Court did not hold that § 1988 does not allow a court to include out-of-pocket expenses other than expert-witness fees in the attorneys' fee award. Moreover, Congress later amended § 1988 to provide that even expert-witness fees should be included in the attorneys' fee award. See 42 U.S.C. § 1988(c); Ziegler Coal Col. v. Dir., Office Workers' Comp. Programs, 326 F.3d 894, 900 n.2 (7th Cir. 2003). Thus, under current law, a prevailing party is entitled to have any reasonable out-of-pocket expenses, including expert-witness fees, included in the fee award.

In addition to arguing that a prevailing party is not entitled to recover out-of-pocket expenses, the City argues that certain of the plaintiffs' claimed expenses are not reasonable: two breakfasts that cost over $30 each, and hotel costs in the amount of $3,813.80. The breakfast charges appear to be so high because they were for room service. It is not

17

unreasonable to pay for room service if it allows counsel to do other work while eating his meal. As for the hotel charges, they are charges that counsel incurred during trial at the hotel across the street from the courthouse. That hotel is one of the more expensive hotels in Milwaukee, but nearly every lawyer from out of town who tries a case in this court stays there because it eliminates travel time and allows more time for trial preparation. Thus, I conclude that the meal and hotel charges were reasonably incurred.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that plaintiffs' motion for attorneys' fees and motion for supplemental attorneys' fees are **GRANTED** to the extent that the plaintiffs are entitled to recover from the City of Milwaukee $425,553.50 in attorneys' fees and $57,033.07 in costs and out-of-pocket expenses, for a total award of $482,586.57.

Dated at Milwaukee, Wisconsin, this 5th day of October 2015.

                                        s/ Lynn Adelman

                                        LYNN ADELMAN
                                        District Judge